1  Eric N. Kohli (NV Bar No. 15763)
2  John E. Bragonje (NV Bar No. 9519)
   LEWIS ROCA ROTHGERBER CHRISTIE LLP
3  3993 Howard Hughes Parkway, Suite 600
   Las Vegas, NV  89169
4  T: (702) 949.8200
   E-mail: EKohli@LewisRoca.com
5  E-mail: JBragonje@LewisRoca.com

6  *Attorneys for Plaintiffs Luxx International, LLC*
   *and Wayde King*

7              **UNITED STATES DISTRICT COURT**
8                   **DISTRICT OF NEVADA**

9  LUXX INTERNATIONAL, LLC, a Florida        Case No.:  2:23-cv-00512
   limited liability company; and WAYDE KING,
10 an individual,

11         Plaintiffs,                        **COMPLAINT**

                                             **(JURY TRIAL DEMANDED)**
   vs.
12
   PURE WATER TECHNOLOGIES, a Nevada
13 limited liability company; TASTY ONE, LLC,
   a foreign limited liability company; MICHAEL
14 KAPLAN, an individual; and ADAM
   KAPLAN, an individual.
15
         Defendants.
16

17         COME NOW, Plaintiffs Luxx International, LLC ("Luxx International") and

18 Wayde King ("King"), by and through their attorneys, and hereby submit this complaint

19 against Defendant Pure Water Technologies, LLC, a Nevada limited liability company

20 ("PWT"), Tasty One, LLC, a foreign limited liability company ("Tasty One"), Michael

21 Kaplan ("Michael"), and Adam Kaplan ("Adam").

22                    <u>**NATURE OF THE ACTION**</u>

23         1.    Plaintiffs' claims comprise common law trademark infringement, federal

24 trademark infringement, trademark dilution, false designation of origin, false advertising,

25 false endorsement, false association, and violations of King's rights of publicity, arising

26 from one or more of the Defendants' unauthorized use in commerce of Plaintiff King's

27 name, likeness, and other intellectual property for the promotion, marketing, and sales of

28 goods and services pertaining to water, particularly water filtration systems. Plaintiffs'

*(sidebar, left margin)* 3993 Howard Hughes Parkway, Suite 600 · Las Vegas, Nevada 89169 · LEWIS ROCA

120783932.1

claims further comprise breach of contract and related causes of action for breach of the parties operating agreement. Plaintiffs seek damages, injunctive relief, and attorneys' fees and costs.

### JURISDICTION

2.      This Court has subject matter jurisdiction over the case pursuant to 28 U.S.C. § 1331 (federal question, Lanham Act 15 U.S.C. § 1121) and § 1338(a) (trademarks). The remaining claims are so related to those claims that they form part of the same case or controversy and are subject to supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

3.      This Court has personal jurisdiction over Defendants due to their domicile in, and their minimum contacts with, the District of Nevada. Further, Defendants have caused injury to Plaintiffs in Nevada through acts occurring both in Nevada and elsewhere, and have engaged in substantial commercial activity within Nevada. Accordingly, Defendants have purposefully availed themselves of the benefits and protections of the laws of Nevada.

4.      Defendant PWT is incorporated in Nevada, operates in Nevada, and purposefully, willfully, and/or intentionally infringed upon Plaintiffs' rights arising under the Lanham Act in Nevada, and with the knowledge that Plaintiffs would likely suffer injury or harm resulting from such infringement.

5.      Defendant Tasty One is incorporated in Nevada, operates in Nevada, and purposefully, willfully, and/or intentionally infringed upon Plaintiffs' rights arising under the Lanham Act in Nevada, and with the knowledge that Plaintiffs would likely suffer injury or harm resulting from such infringement.

6.      Defendants Michael Kaplan and Adam Kaplan (collectively "the Kaplans") are both natural persons who reside in Las Vegas, Nevada. Both of them purposefully, willfully, and/or intentionally infringed Plaintiffs' trademark rights in Nevada, either individually or in concert with one or more of the other Defendants, and engaged in other acts and omissions in Nevada, with the knowledge that Plaintiffs would likely suffer injury or harm resulting from such infringement and/or acts and omissions.

-2-

3993 Howard Hughes Parkway, Suite 600
Las Vegas, Nevada 89169

LEWIS ROCA

7.    Venue is proper in this Court under 28 U.S.C. § 1391(b) because, *inter alia*, the wrongs committed by Defendants occurred within this District, and the harm caused by Defendants' actions has been felt, and will be felt, in this District.

**PARTIES**

8.    Plaintiff King is a natural person who resides in Las Vegas, Nevada. King is a public figure famous for his commercial activities pertaining to water-related goods and services and variety of media appearances.

9.    Plaintiff Luxx is a Florida limited liability company with its principal place of business in Lighthouse Point, Florida. It has provided services to the Defendants pursuant to one or more contracts with Defendants.

10.    Defendant PWT is a Nevada limited liability company with an address at 5502 S. Ft. Apache, Suite 100, Las Vegas, Nevada 89148. PWT is engaged in the business of providing goods and services in commerce pertaining to water, especially water filtration systems.

11.    Defendant Tasty One is a New Mexico limited liability company registered in Nevada, with an address at 5502 S. Ft. Apache, Ste 100, Las Vegas, Nevada 89148. Tasty One is engaged in the business of providing goods and services in commerce pertaining to water, including water filtration systems.

12.    Defendant Michael Kaplan is a natural person who resides in Las Vegas, Nevada. Upon information and belief, Michael is a principal owner and operator of PWT and Tasty One. Further upon information and belief, Michael Kaplan is the father of Defendant Adam Kaplan.

13.    Defendant Adam Kaplan is a natural person who resides in Las Vegas, Nevada. Adam is the manager and the registered agent for PWT and Tasty One. Based upon information and belief, Adam is an owner and operator of PWT and Tasty One in concert with Michael Kaplan. Further upon information and belief, Adam is the son of Defendant Michael Kaplan.

14.    At all relevant times, each of the Defendants were the agents, ostensible

-3-

120783932.1

agents, servants, employees, employers, partners, co-workers, and/or joint venturers of their co-defendants, and were acting within the color, purpose, and scope of their employment, agency, ownership, and/or joint ventures. Because of such inter-relationships, each of the Defendants are vicariously and jointly and severally liable for the acts and/or omissions of their co-defendants.

## **ALLEGATIONS COMMON TO ALL COUNTS**

15.    Plaintiffs repeat and reallege all allegations in the preceding paragraphs above as though fully set forth herein.

**Plaintiff Wayde King**

16.    Since at least as early as 2010, King has engaged in the endorsement, marketing, promotion, sales, and other activities pertaining to water in interstate commerce. Such commercial activities include King's use of his name, his identity, his likeness, his image, his face, and the like.

17.    King's commercial activities pertaining to water include publicized commercial promotions for large companies such as Toyota and Dairy Queen and playing the lead role in a successful television show titled *TANKED*. *TANKED* concerned designing, building, implementing, and populating fish tanks with marine life coupled with water appropriate for the respective marine life. *TANKED* aired for several years on popular television channels such as Animal Planet and Discovery Channel. King's activities and clientele on *TANKED* included some famous celebrities. King is also known for assisting with the Flint, Michigan, drinking water crisis in 2014, including the publicized donations of water filtration systems in collaboration with Elon Musk.

18.    Through his various commercial activities pertaining to water, since at least as early as 2010, King has built significant goodwill in his name and likeness. He has continuously used his name and likeness in interstate commerce for goods and services pertaining to water during that time, and continues to do so. His name and likeness are recognized by consumers for goods and services pertaining to water, including water filtration systems.

-4-

120783932.1

19.     King has never sold or assigned his rights to his name, to his likeness, or to any marks bearing his name, to anyone. King has only licensed the use of his marks, his name, and his likeness to specific entities, for specific commercial projects, and for a specific time.

20.     King has never abandoned his rights in his marks, name, or likeness, nor has he ever had any intent to abandon such rights.

**Defendants PWT and Tasty One**

21.     On or about July 14, 2017, Luxx and King entered into an operating agreement (the "Operating Agreement") with the Kaplans to create and to operate PWT. A copy of the Operating Agreement is attached as Exhibit 1.

22.     The stated intent of the parties was for PWT to "always be operated in a manner consistent with its Articles," and that "no Member shall take any action inconsistent with the express intent of the parties." *See* Exhibit 1, ¶1.2.

23.     The Operating Agreement states the respective ownership interests of the parties as:

| | | | |
|---|---|---|---|
| Michael Kaplan | - | 35%, | for "cash, and business expertise;" |
| Adam Kaplan | - | 15%, | for "cash, and business expertise;" |
| Wayde King | - | 35%, | for "business expertise;" |
| Luxx International | - | 15%, | for "business expertise." |

*See* Exhibit 1, ¶ 2.1 and ¶ 6.1.

24.     At that time the parties organized PWT, King agreed to the use of his name and likeness for the benefit of his ownership interests in PWT's commercial endeavors, including the advertising, promotion, and sales of water-related goods and services, including water filtration systems. King's narrow authorization for PWT to use his name, likeness, and marks was contingent on his continued ownership interest in PWT and limited to the extent that his ownership interest in PWT was also benefitted by such use.

25.     PWT's promotional commercials, brochures, etc., included King's name and likeness to promote goods and services pertaining to water, including water filtration systems. In addition to the use of King's name and likeness, one or more of the Defendants

3993 Howard Hughes Parkway, Suite 600
Las Vegas, Nevada 89169

LEWIS ROCA

-5-

used the following mark ("Original Mark") for selling water related goods and services in commerce, including water filtration systems:



The Original Mark includes King's full name, the words "water filtration," a partial "C" around the letters "WK" (which are the initials for Wayde King), and a crown on top of the letter "W."

26.    At some point in time after Defendants' use of the Original Mark in commerce, unbeknownst to King, Defendants modified the Original Mark and created a revised mark ("Revised Mark") and commenced using it to continue to sell the same or similar goods and services in commerce. The Revised Mark is:



The Revised Mark, similar to as the Original Mark, includes King's last name, the words "water filtration," a partial "C" around the letters "KW," and a crown on top of the letter "W." The Revised Mark is substantially the same as the Original Mark with only small alterations. Those small alterations are not immediately discernible to the naked eye when

compared to the Original Mark. Consequently, the two marks are confusingly similar in style, appearance, and content, especially from an average consumer's perspective.

27.    One or more of the Defendants currently own, control, and operate a public website ("Website") under the domain name KINGWATERFILTRATION.COM ("Domain Name"). The Website advertises and promotes sales of goods and services pertaining to water, including water filtration systems. The Website prominently displays the Revised Mark. The Domain name comprises King's last name with "water filtration." A copy of the Website's home page is attached as Exhibit 2.

28.    Since then, one or more of the Defendants have federally registered the Original Mark and the Revised Mark. Specifically, one or more of the Defendants own U.S. Trademark Reg. No. 5,605,139 for the Original Mark, and U.S. Trademark Reg. No. 6,278,082 for the Revised Mark. Further, Defendants own U.S. Trademark Reg. No. 6,277,699 for the word mark KING WATER FILTRATION. (Collectively "Federal Trademark Registrations.")

29.    Of the three Federal Trademark Registrations, King only provided limited authorization for the registration of the Original Mark, subject to King's continued ownership in PWT.

30.    Although King granted limited authorization for registration of the Original Mark, which was required by the United States Patent and Trademark Office ("USPTO"), King did not convey, and has never conveyed, any ownership interest of King's common law rights to use his name, likeness, or image, including the use of his name and initials in connection with the Original Mark to anyone, including the Defendants. Particularly, King has never executed a written agreement conveying such rights.

31.    On or about August 18, 2017, Defendants filed a federal trademark registration application ("Application") for the mark THE KING OF WATER WAYDE KWF KING WATER FILTRATION. (USPTO Application Ser. No. 87,575,101). The mark includes King's full name, and "water filtration." On November 29, 2017, the USPTO required Defendants to provide King's consent to register the mark. King did not provide

120783932.1

1    consent, whereupon the Application went abandoned.

2        32.    The mark in the Application comprises the term "KWF," along with King's

3    full name "WAYDE KING." Upon information and belief, "KWF" is an acronym for KING

4    WATER FILTRATION, which is also Defendants' current Domain Name. Defendants

5    have continued using King's name, either King's full name or just his last name, with "water

6    filtration" in marks for water-related goods and services in interstate commerce, especially

7    for selling water filtration systems.

8        33.    King and Luxx contributed significant business expertise and efforts for the

9    advertising, promotion, and sales of water-related goods and services for one or more of the

10   Defendants, especially for the sales of water filtration systems. King's activities included

11   personal appearances to promote the goods and services, attending promotional events for

12   PWT, and at least one episode of *TANKED* that promoted one or more of the Defendants,

13   including their water filtration systems. Plaintiffs' contributions for one or more of the

14   Defendants further included designing the shipping containers that were used for shipping

15   PWT's products, designing a light-up show for the sales floor of Home Depot retail stores

16   to promote Defendants' products and services pertaining to water, particularly water

17   filtration systems, and the like. Luxx's efforts included obtaining large retail accounts, such

18   as Home Depot and Lowe's hardware stores, that did significant volumes of sales of

19   Defendants' goods and services, especially water filtration systems, bearing King's name

20   and/or likeness, the Original Mark, or the Revised Mark.

21       34.    Shortly after one or more of the Defendants commenced using King's name

22   and likeness to sell goods and services pertaining to water, including water filtration

23   systems, which was in or about 2017, Defendants' sales and profits multiplied many fold.

24   Based upon information and belief, that significant increase in Defendants' sales and profits

25   is directly attributable to the use of King's name and likeness to promote their goods and

26   services, coupled with Luxx's efforts and promotional activities to obtain large clients for

27   retail sales of the goods and services. Further, based on information and belief, the many-

28   fold increase in Defendants' sales and profits was in the tens of millions of dollars, the exact

120783932.1

amount of which will be established at trial.

35.    Based upon information and belief, Tasty One also engaged in the sales of water-related products and services, especially water filtration systems, bearing King's name and likeness and/or the Original Mark or the Revised Mark. Based upon information and belief, the consumers of such sales intended those sales for PWT, but the Kaplans diverted the sales to Tasty One, ostensibly to cheat Plaintiffs out of their share of the profits. Such sales by Tasty One were not authorized by Plaintiffs, and Plaintiffs were not aware of such sales when they occurred.

36.    Based upon information and belief, PWT and Tasty One offered significant discounts for cash payments for the purchase of goods and services pertaining to water-related products bearing King's name and/or likeness, and/or the Original Mark or the Revised Mark. Such sales often resulted from Luxx's efforts. However, based upon information and belief, Defendants did not record or account for most of such cash sales. Further upon information and belief, one or more of the Defendants pocketed such cash proceeds, presumably to cheat Plaintiffs out of their share of the profits.

**Defendants' continuing infringement**

37.    Upon information and belief, the Defendants combined have sold water related goods and services, especially water filtration systems, bearing King's name and/or likeness, including the Original Mark or the Revised Mark, in excess of $10 million from 2017 to the present, the exact amount of which will be established at trial.

38.    Based on information and belief, one or more of the Defendants are currently continuing to sell water-related goods and services, especially water filtration systems, bearing King's name and/or likeness, including the Original Mark or the Revised Mark, or confusingly similar variations thereof.

39.    At least one currently active account and page on Linked In, a public social media site ("Social Media Page"), that is owned and controlled by one or more of the Defendants promotes sales of water-related goods and services, including water filtration systems, under King's name and likeness. The Social Media Page prominently displays the

Original Mark. It states, *inter alia*, that:

> After more than 30 years of designing and building custom aquatic tanks for some of the world's wealthiest and most famous clientele, Wayde King created the first Maintenance-Free, Whole House, Salt-Free Water Filtration and Conditioning System with Built-In Hard Water Scale Reducing Magnetic Ionizer. It's the most technologically advanced, maintenance-free, water treatment system available in today's marketplace.

The page mentions King by his full name and presents King's background pertaining to water-related goods and services, while prominently bearing the Original Mark. A copy of the page is attached as Exhibit 3.

40.     Upon information and belief, in the recent past, a brochure promoting PWT's water filtration systems ("Brochure") was handed out to a customer at the retail hardware store Home Depot. Based upon information and belief, Home Depot has been, and continues to be, a significant retail outlet for one or more of the Defendants. The Brochure prominently displays a full picture of King on the first page, with King's arm on a water filtration system bearing the Original Mark. King's name is mentioned several times. It prominently displays the Original Mark at the top of the first page. The Brochure promotes one or more of the Defendants' water-related products and services, particularly water filtration systems. It attributes a quote to King as follows:

> Wayde King, star of the hit TV show, "Tanked," says "This is the best system you could buy or I wouldn't put my name on it."

A copy of the brochure is attached as Exhibit 4.

41.     A home show ("Show") was held at the Rio Hotel and Casino in Las Vegas on or about May 6, 2022. One or more of the Defendants hosted a booth ("Booth") at the Show for promoting their water-related goods and services, including water filtration systems. Upon information and belief, one or more of the Defendants partnered with hardware retailer Home Depot to host the Booth. At least two consumers were actually confused about the Revised Mark displayed at the Booth with the Original Mark. Upon the two consumers' inquiry at the Booth about King, one or more of the Defendants and/or their agents represented to the consumers that although King was not present at the Booth, he

-10-

was present "in the back of the building." Accordingly, one or more of the Defendants, by and through their agents, were continuing to assert an association between King and Defendants' goods and services pertaining to water, including water filtration systems, as recently as May, 2022. Even worse, this was towards consumers actually confused by one or more of the Defendants' use of marks bearing King's name and the Revised Mark for water-related goods and services.

42. Based on information and belief, one or more of the Defendants continue to actively use the Original Mark, the Revised Mark, and/or King's name or likeness for selling water related goods and services in interstate commerce, including water filtration systems. Such activities include Defendants' Website, their Domain Name, and their Social Media Page.

**Defendants purport to terminate Plaintiffs' rights**

43. As explained above, the parties formed PWT and entered into the Operating Agreement for the purposes of doing business together. The Operating Agreement states, in fact, that this "Company has been formed to own and operate a water purification sales business." *See* Exhibit 1, ¶ 1.6.

44. Since the time of PWT's formation, the Plaintiffs have collectively owned 50% of the company: King owned 35% and Luxx International owned 15%. *See* Exhibit 1, ¶ 2.1 and ¶ 6.1.

45. The Operating Agreement requires *all member meetings* to occur only after notice: "written notice stating the place, day and hour of the meeting and the purpose or purposes for which the meeting is called shall be delivered not less than three nor more than fifty days before the date of the meeting, either personally or by mail, by or at the direction of the Manager or person or persons calling the meeting, to each member entitled to vote at such meeting." Exhibit 1, ¶ 5.4.

46. Despite this term, the Kaplans purported to hold a meeting without notice on March 24, 2019. The Kaplans say, in spurious meeting minutes, that King called the meeting in order to discuss "the recent capital call issued by Adam Kaplan on March 11,

-11-

2019 in the amount of $100,000 to be shared equally among the partners." This capital call never occurred, nor was this supposed meeting preceded by the required notice.

47.    Nevertheless, the Kaplans act as if the capital call were legitimate. By way of a so-called "Resolution in Lieu of Managers Meeting" dated April 26, 2019, the Kaplans purport to have held a meeting, which was never noticed; to claim that Luxx International failed to make "the additional Capital Contribution" (the document says nothing about King failing to make a contribution); and to "dilute the interest of the Defaulting Members." This purported resolution is signed by Adam Kaplan as "Manager."

48.    In addition to the reasons already given, this spurious resolution is null, void, and defective in that it is signed by a company manager. Under the Operating Agreement, company managers have no authority to notice, participate in, or take action pursuant to a meeting of the members, nor do a manager's powers under the Operating Agreement extend to internal affairs and governance issues, such as capital calls and remedies for failure to answer such. *See* Exhibit 1, ¶ 3.3.

49.    Under the Operating Agreement "Additional Capital Contributions" "shall be requested *only* "*to make additional purchases and acquisitions* for the Company." *See* Exhibit 1, ¶ 2.2 (emphasis added).

50.    Upon information and belief, the Kaplans themselves did not make their respective capital contributions pursuant to the purported capital call.

51.    Furthermore, no "Additional Capital Contributions" were required at this time because there was no need to make "additional purchases and acquisitions." Upon information and belief, PWT operations were easily generating (or would have generated but for the inappropriate discounts and diversions) revenue necessary to fund any "additional" purchases or acquisitions.

52.    Nevertheless, the Kaplans have proceeded as if the Plaintiffs' membership interests have been forfeited. The Kaplans supposedly issued this purported capital call ("Purported Capital Call") for PWT in the amount of $100,000.00. The four members with ownership interest in PWT were each allegedly responsible for their respective ownership

-12-

3993 Howard Hughes Parkway, Suite 600
Las Vegas, Nevada 89169

LEWIS ROCA

percentage share of the Purported Capital Call. King was allegedly responsible for $35,000, and Luxx was allegedly responsible for $15,000.

53.     Alleging Plaintiffs' failure to contribute their respective amounts pursuant to the Purported Capital Call, the Kaplans told Plaintiffs that their ownership interests in PWT had been terminated. Defendants have effectively frozen Plaintiffs out of the company by denying them all rights to which they are entitled under the Operating Agreement, including the right to participate in management, the right to inspect the Company's books, and the right to distributions.

54.     The Operating Agreement provides for a remedy for the delayed payment of a capital call, with no time limit for such cure. The Operating Agreement provides:

> If a member fails to make an Additional Capital Contribution, all amounts distributable by this Company to the Member in any capacity, shall be suspended, and the Member's right to receive distributions from this Company shall not be restored until the Member shall have paid in full to the Company the delinquent Additional Capital Contribution, <u>plus</u> interest on such amount at the legal rate from the date its Additional Capital Contribution should have been paid to the date it is paid by the Member <u>plus</u> any damages, losses and expenses, determined in its sole discretion, to the Company attributable to the failure to timely pay the Additional Capital Contribution, plus reimbursement of any reasonable costs and expenses incurred by the Company or any Member to enforce the collection of the delinquent Capital Contribution.

*See* ¶2.2 of the Operating Agreement (emphasis in original).

55.     After Plaintiffs' PWT membership interests were allegedly terminated, one or more of the Defendants continued using, and still continue to use, Wayde King's name and likeness, the Original Mark, and/or the Revised Mark, for advertising, promoting, and selling water-related products and services, including water filtration systems. Defendants' use of King's name or likeness, or use of the Original Mark or the Revised Mark, was authorized by King only to the extent that King continues to owns his original percentage share of PWT, and only to the extent that he receives his respective share of the income and profits of PWT and the other Defendants' sales pertaining to water-related goods and services that are associated with King's name or likeness in any form.

56.     In the event the Court finds that Plaintiffs do not own their respective

-13-

ownership shares in PWT, or are not entitled to their respective shares of PWT's income and profits for any particular period of time, PWT's use of King's name and/or likeness in commerce is unauthorized. All of the Kaplans' and Tasty One's use of King's name and/or likeness in commerce is unauthorized.

57.    Wayde King has never been paid anything by the Defendants.

58.    Luxx was paid some small amounts by the Defendants prior to 2019. However, Luxx has not been paid a substantial portion of his share of Defendants' income and profits.

## COUNT I

***Common law and State statutory trademark infringement, NRS Ch. 600***

59.    Plaintiffs incorporate the allegations in the preceding paragraphs as if fully set forth herein.

60.    King has used his name and likeness in commerce in connection with a range of goods and services pertaining to water since at least as early as 2010. King's use in commerce has been continuous. As a result, King owns valid and protectable common law rights therein.

61.    King's use of his name and likeness in commerce for goods and services pertaining to water predates Defendants' use of King's name, the Original Mark, and the Revised Mark.

62.    Defendants' unauthorized use of King's name, the Original Mark, or the Revised Mark in connection with water related goods and services, and in Defendants' Domain Name, constitutes a reproduction, copying, counterfeit, and/or colorable imitation of King's name or likeness in a manner that has deceived consumers, and is likely to cause further confusion or mistake.

63.    Defendants' unauthorized use of King's name and likeness in commerce has been willful, deliberate, and intentional. Upon information and belief, Defendants' use was designed to usurp and wrongfully trade off of the substantial investment and goodwill that King has developed in his name and likeness.

-14-

120783932.1

64.    Defendants' unauthorized use of King's name or likeness, the Revised Mark, and the Domain Name for selling water-related goods and services was committed with knowledge that such use was intended to cause confusion, mistake, or deception. Further, Defendants' unauthorized use of King's name or likeness in the Original Mark for selling water-related goods and services was committed with knowledge that such use was intended to cause confusion, mistake, or deception.

65.    Defendants' unauthorized use of King's name and/or likeness in commerce constitutes trademark infringement in violation of the common law of Nevada because such use has caused confusion, and is likely to cause further confusion, as to the source or sponsorship of Defendants' water-related goods and services. Defendants' acts have caused a likelihood of injury to King's goodwill and business reputation and have impaired the effectiveness of King's rights in his name and likeness.

66.    Defendants' acts have violated, and one or more Defendants' acts continue to violate, the trademark laws of the State of Nevada, NRS Chapter 600.

67.    As a direct and proximate result of Defendants' actions, Defendants have been unjustly enriched and King has been injured and damaged. King has suffered, and will continue to suffer, monetary loss and irreparable harm to his businesses, reputation, and goodwill. Unless Defendants' foregoing actions are enjoined, King will continue to suffer injury and damage.

68.    King has no adequate remedy at law. Defendants' have caused, and one or more Defendants will continue to cause if not enjoined, irreparable harm to King's rights in his name and his likeness, and to his business, reputation, and goodwill. King is entitled to all remedies available under NRS 600.430, including injunctive relief, treble damages as compensatory damages, and reasonable attorney's fees and costs under the statute.

## COUNT II

### *False Designation of Origin under the Lanham Act, 15 U.S.C. § 1125(a)(1)*

69.    Plaintiffs incorporate the allegations in the preceding paragraphs as if fully set forth herein.

120783932.1

70.     Defendants' unauthorized use of King's name and/or likeness in commerce in connection with one or more of the Defendants' advertisement, promotion, distribution, offers of sale, and sales of goods and services pertaining to water. Defendants' unauthorized use of King's name and/or likeness falsely indicates to consumers that Defendants and their products and services pertaining to water, including water filtration systems, are connected with, sponsored by, affiliated with, or related to King. Defendants' such use was with full knowledge of the falsity of such designation of origin and to the detriment of King.

71.     Defendants' unauthorized use of King's name or likeness, the Original Mark, or the Revised Mark, on their Website, and for their goods and services constitutes false descriptions and representations tending to falsely describe or represent one or more of the Defendants and their products as being authorized, sponsored, affiliated, or associated with King.

72.     One or more of the Defendants have used King's name and likeness, the Original Mark, and/or the Revised Mark, without authorization, on their Website and for their goods and services with the express intent to cause confusion and mistake, to deceive and mislead the public, to trade upon King's reputation, and to improperly appropriate to themselves King's valuable trademark rights. That further includes one or more of the Defendants' actions with the Brochure, their Booth at the Show, and on their Social Media Page.

73.     Defendants' unauthorized acts constitute the use in commerce of false designations of origin and false and/or misleading descriptions or representations, tending to falsely or misleadingly describe and/or represent their products as those originating from King in violation of §43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

## COUNT III

### *False Advertising under the Lanham Act, 15 U.S.C. § 1125(c)*

74.     Plaintiffs incorporate the allegations in the preceding paragraphs as if fully set forth herein.

75.     To the extent that Defendants' use of Plaintiff's name and/or likeness is

3993 Howard Hughes Parkway, Suite 600
Las Vegas, Nevada 89169

LEWIS ROCA

unauthorized, one or more of the Defendants have made, and continue to make, false or misleading representations of fact in commercial advertising regarding their goods and services pertaining to water, including water filtration systems. Their false and misleading representations of fact include using King's name and likeness, the Original Mark, and/or the Revised Mark, to sell their water-related goods and services in interstate commerce.

76.     To the extent that Defendants' use of Plaintiff's name and/or likeness is unauthorized, one or more of the Defendants' false and misleading statements have deceived, or have the tendency to deceive, a substantial segment of their intended audience about matters that are material to purchasing decisions, as evidenced by Defendants' own success once they began asserting King's name and likeness to be associated with their goods and services pertaining to water, including water filtration systems.

77.     Defendants knew, or should have known, that its unauthorized advertising and promotional activities bearing King's name or likeness were false, and/or misleading, and/or deceptive.

78.     To the extent that Defendants' use of Plaintiff's name and/or likeness is unauthorized, one or more of the Defendants' deception is material in that it has, and is likely to, influence purchasing decisions among consumers for goods and services pertaining to water, including water filtration systems.

79.     As the direct and proximate result of Defendants' unauthorized conduct, King has suffered, and is likely to further suffer, injury resulting from Defendants' false or misleading advertising. Further, King has suffered, and will likely continue to suffer, monetary loss and irreparable injury to his business, reputation, and goodwill.

80.     To the extent that Defendants' use of Plaintiff's name and/or likeness is unauthorized, one or more of the Defendants' false and/or misleading statements were made, and are made, in commercial advertising and promotion in interstate commerce. They violate § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

81.     To the extent that Defendants' use of Plaintiff's name and/or likeness is unauthorized, one or more of the Defendants' conduct has injured King and the general

public, and unless enjoined, will continue to cause irreparable injury to King and the general public. The balance of equities and the public interest favor enjoining Defendants' unlawful conduct. King is therefore entitled to equitable relief, including injunctive relief, against Defendants.

## COUNT IV

### *False Endorsement under the Lanham Act, 15 U.S.C. § 1125(a)*

82.     Plaintiffs incorporate the allegations in the preceding paragraphs as if fully set forth herein.

83.     Defendants' unauthorized use in commerce of King's name and likeness, including in the Original Mark and the Revised Mark, is likely to cause confusion, mistake, or deceive as to the Defendants' affiliation, connection, or association with King and as to the sponsorship or approval of the Defendants' goods, services, or commercial activities by King.

84.     As the result of Defendants' unauthorized acts as alleged herein, King has suffered, and will continue to suffer, irreparable harm and damages to his business, goodwill, reputation, and profits, while Defendants profit at King's expense.

85.     Defendants' unauthorized use of King's name, his likeness, and the Revised Mark, and their unauthorized use of the Original Mark, constitutes false endorsement in violation of 15 U.S.C. § 1125(a).

86.     Defendants' unauthorized actions as alleged herein, and the ongoing direct results of those actions, have caused and will continue to cause great and irreparable harm to King in an amount that cannot be ascertained, thereby leaving King with no adequate remedy at law.

87.     To the extent that Defendants' use of Plaintiff's name and/or likeness is unauthorized, unless Defendants are preliminarily and permanently enjoined from engaging in false endorsement and unfair competition, King will continue to suffer irreparable harm. King is entitled to preliminary and permanent injunctive relief against Defendants pursuant to 15 U.S.C. § 1116.

-18-

120783932.1

88.    King is also entitled to recover Defendants' profits derived from the unauthorized uses of King's name, his likeness, the Revised Mark, and the Original Mark, as well as damages that King has suffered by reason thereof.

89.    Pursuant to 15 U.S.C. §§ 1117(a) and 1117(b), King is also entitled to an award of treble damages, attorneys' fees, and costs, as Defendants' actions of creating and using the Revised Mark, and the continued unauthorized use of King's name and likeness, were willful, egregious, and otherwise exceptional in association with Defendants' violations of 15 U.S.C. § 1125(a) with respect to King's name and likeness.

## COUNT V

### *False Association under the Lanham Act, 15 U.S.C. § 1125(a)*

90.    Plaintiffs incorporate the allegations in the preceding paragraphs as if fully set forth herein.

91.    Defendants' continuing unauthorized use of King's name and/or likeness, including continuing unauthorized use of their Website, Domain Name, social media posts (including on the Social Media Page), advertising brochures, including the Brochure, and the like, with King's name, likeness, and/or professional background information, and the Original Mark bearing King's name or the confusingly similar Revised Mark, each bearing King's name, for the promotion and association of Defendants' water-related goods and services with King, have caused, and are likely to further cause, confusion, mistake, or deception as to the affiliation, connection, or association of Defendants' goods and services with King as to the origin, sponsorship, or approval of Defendants' goods and services, in violation of § 43 of the Lanham Act (15 U.S.C. § 1125(a)(1)).

92.    Defendants had direct and full knowledge of King's prior use of, and rights in, King's name and likeness before Defendants' unauthorized use of the Original Mark, the Revised Mark, or any other marks bearing King's name and/or likeness and before other acts complained of herein. The knowing, intentional, and willful nature of Defendants' unauthorized acts renders this an exceptional case under 15 U.S.C. § 1117(a).

93.    As a result of Defendants' unauthorized conduct, King has suffered

-19-

3993 Howard Hughes Parkway, Suite 600
Las Vegas, Nevada 89169

LEWIS ROCA

commercial damage, as well as the continuing loss of the goodwill and reputation that King has established in his name and likeness. This continuing loss of goodwill cannot be properly calculated and constitutes irreparable harm and an injury for which King has no adequate remedy at law. King will continue to suffer irreparable harm unless this Court enjoins Defendants' unauthorized conduct through the removal of all associations with King's name and likeness, the Original Mark, and the Revised Mark, from all of Defendants' social media, including the Social Media Page, advertising, brochures, including the Brochure, Website, Domain Name, commercial representations to the public, and the like.

## <u>COUNT VI</u>

### *Cybersquatting under the Anticybersquatting Consumer Protection Act,*
### *15 U.S.C. § 1125(c)*

94.     Plaintiffs incorporate the allegations in the preceding paragraphs as if fully set forth herein.

95.     Defendants registered, trafficked in, and/or used the <kingwaterfiltration.com> Domain Name.

96.     The Domain Name is confusingly similar to King's name and its association with water related goods and services. It contains King's name "KING" and the words "water" and "filtration." The Domain Name's initials, "KWF," are included in the mark in federal trademark registration Application Ser. No. 87,575,101, which mark also included, along with "KWF," King's full name ("WAYDE KING") and "WATER FILTRATION."

97.     King's name was distinctive when one or more of the Defendants registered, trafficked in, and/or used the Domain Name, to the extent that Defendants' use of Plaintiff's name and/or likeness was unauthorized.

98.     Upon information and belief, to the extent that Defendants' use of Plaintiff's name and/or likeness was unauthorized, Defendants had or have a bad faith intent to profit from King's name when they registered, trafficked in, and/or used the Domain Name.

99.     To the extent that Defendants' use of Plaintiff's name and/or likeness is

-20-

unauthorized, Defendants' cybersquatting has caused King to suffer irreparable injury and monetary damages in an amount to be determined at trial.

100.    Upon information and belief, Defendants' unauthorized conduct is willful, intentional, and/or conducted in bad faith, thereby rendering this case exceptional within the meaning of Section 35(a) of the Lanham Act, 15 U.S.C. § 1117(a).

**COUNT VII**

***Right of Publicity under NRS 597.770 et seq.***

101.    Plaintiffs incorporate the foregoing allegations by reference as if fully set forth herein.

102.    To the extent that Defendants' use of Plaintiff's name and/or likeness is unauthorized, one or more of the Defendants have made, and continue to make, commercial use of King's name, his photographs, and/or his likeness in the State of Nevada without obtaining his written consent.

103.    To the extent that Defendants' use of Plaintiff's name and/or likeness is unauthorized, one or more of the Defendants' conduct has caused King to suffer harm in an amount to be determined at trial. Further, Defendants' unauthorized conduct has caused King irreparable harm, and Defendants' continuing unauthorized conduct is causing King irreparable harm. Such harm will continue until the Court enjoins Defendants' unauthorized conduct.

104.    Defendants' unauthorized conduct violates King's rights of publicity pursuant to NRS 597.790.

105.    Defendants are liable to King for damages to be proven at trial and for injunctive relief pursuant to NRS 597.810.

**COUNT VIII**

***Unfair and Deceptive Trade Practices (NRS Ch. 598)***

106.    Plaintiffs incorporate the foregoing allegations by reference as if fully set forth herein.

107.    To the extent that Defendants' use of Plaintiff's name and/or likeness is

-21-

120783932.1

unauthorized, one or more of the Defendants are falsely and knowingly representing through their displays of King's likeness and through the use of his name that they are affiliated with, sponsored by, or approved by, King. Defendants' unauthorized actions have, and are likely to continue, deceiving and misleading the public.

108.    Defendants' unauthorized acts constitute deceptive trade practices in violation of the Nevada Deceptive Trade and Unfair Practices Act, NRS 598.0915, because Defendants are knowingly passing off their water-related goods and services as affiliated with, sponsored by, or approved by King.

109.    To the extent that Defendants' use of Plaintiff's name and/or likeness is unauthorized, one or more of the Defendants' wrongful acts, including misappropriation of King's name or likeness to gain an unfair advantage, interference with contracts, use of Luxx's services without compensation, and other deceptive, unethical, and unscrupulous conduct, constitute unfair and deceptive trade practices pursuant to NRS 598.0953.

110.    As a result, Defendants have been unjustly enriched and Plaintiffs have been injured and damaged. Unless Defendants' unauthorized actions are enjoined, Plaintiffs will continue to suffer injury and damage.

## COUNT IX

### *Unjust enrichment*

111.    Plaintiffs incorporate the foregoing allegations by reference as if fully set forth herein.

112.    Defendants' unauthorized acts complained of herein have conferred benefits upon the Defendants at Plaintiffs' expense and to Plaintiffs' loss and detriment. Defendants have unjustly obtained and benefitted from said benefits at Plaintiffs' expense and to their loss and detriment.

113.    By their unauthorized actions, Defendants continue to accept and retain benefits at Plaintiffs' expense, loss, and detriment.

114.    As a result, Defendants have been unjustly enriched and Plaintiffs have been injured and damaged. Defendants' retention of said benefits without proper compensation

-22-

3993 Howard Hughes Parkway, Suite 600
Las Vegas, Nevada 89169

LEWIS ROCA

1    to Plaintiffs would be inequitable.

2        115.    As a direct and proximate result of Defendants' unauthorized conduct,

3    Plaintiffs have sustained, and will continue to sustain, actual and/or consequential damages

4    in an amount to be determined at trial. Plaintiffs are entitled to recover such damages and

5    are entitled to restitution from Defendants.

6        116.    Unless Defendants' foregoing alleged unauthorized actions are enjoined,

7    Plaintiff will continue to suffer said damages.

8                                    **COUNT X**

9        ***Cancellation of the Three Federal Trademark Registrations,***
        ***Lanham Act 15 U.S.C. § 1064***
10

11       117.    Plaintiffs incorporate the foregoing allegations by reference as if fully set

12    forth herein.

13       118.    King owns common law trademark rights in his name. To the extent that one

14    or more of the Defendants' use of Plaintiff's name and/or likeness is unauthorized, they

15    have obtained the three Federal Trademark Registrations using King's name for goods

16    and/or services pertaining to water. The three Federal Trademark Registrations are U.S.

17    Trademark Reg. No. 5,605,139 for the Original Mark, U.S. Trademark Reg. No. 6,278,082

18    for the Revised Mark, and U.S. Trademark Reg. No. 6,277,699 for the word mark KING

19    WATER FILTRATION. To the extent that Defendants' use and/or registration thereof is

20    unauthorized, these marks infringe King's common law trademark rights for goods and/or

21    services pertaining to water.

22       119.    To the extent that Defendants' use of Plaintiff's name and/or likeness is

23    unauthorized, one or more of the Defendants obtained at least two of the Federal Trademark

24    Registrations by making false and material representations of fact in the respective

25    trademark application with the intent to deceive the USPTO.

26       120.    Upon information and belief, one or more of the Defendants' fraudulent

27    registrations have caused Plaintiffs to suffer injury.

28    / / /

120783932.1

3993 Howard Hughes Parkway, Suite 600
Las Vegas, Nevada 89169

LEWIS ROCA

3993 Howard Hughes Parkway, Suite 600
Las Vegas, Nevada 89169

LEWIS ROCA

## COUNT XI

### *Breach of Contract - Kaplan Defendants*

121.    Plaintiffs incorporate the allegations in the preceding paragraphs as if fully set forth herein.

122.    Plaintiffs, on the one hand, and the Kaplan Defendants, on the other hand, are parties to the Operating Agreement, which is a valid and enforceable contract.

123.    Plaintiffs have performed all acts required of them by the Operating Agreement in the manner and time specified by said agreement, or were excused from performance of said obligations.

124.    The Kaplan Defendants breached their obligations to Plaintiffs under the Operating Agreement, by, among other things:

- Purporting to make a call for "Additional Capital Contributions" when such were unwarranted in light of PWT's financial performance at the time of the Purported Capital Call, on or about April 11, 2019.

- Purporting to make a call for "Additional Capital Contributions" for purposes other than "to make additional purchases and acquisitions for the Company" as required by Section 2.2 of the Operating Agreement.

- Purporting to make a call for "Additional Capital Contributions" as a pretext, sham, or other means of oppression directed towards the Plaintiffs, and not for a legitimate business purpose.

- Failing, refusing, and neglecting to make distributions to Plaintiffs as required by the Operating Agreement.

- Failing, refusing, and neglecting to pay Plaintiffs for services they rendered as employees of PWT.

- Even assuming, arguendo, that the Purported Capital Call were lawful and authorized (which it is not), thereafter failing, refusing, and neglecting to advise Plaintiffs what the supposed "Delinquency Amount" is so that Plaintiffs may resume receiving distributions, participating in management,

-24-

120783932.1

and otherwise exercising their rights and obligations as PWT members.

- Even assuming, arguendo, that the Purported Capital Call were lawful and authorized (which it is not), thereafter failing, refusing, and neglecting to advise Plaintiffs whether PWT has simply elected to recoup the "Delinquency Amount" from "amounts otherwise distributable to the Member" pursuant to Operating Agreement Section 2.02.

- Failing, refusing, and neglecting to provide Plaintiffs with PWT books and records or any other information about PWT's performance and standing, even though Plaintiffs continue to collectively hold 50% of the PWT membership interests.

- Offering significant discounts for cash payments for the purchase of goods and services pertaining to water-related products bearing King's name and/or likeness, and/or the Original Mark or the Revised Mark and then refusing to report the cash sales on the PWT books and pocketing the money, thereby depriving Plaintiffs of the value of their membership interests.

- Diverting sales from PWT to Tasty One, even though the consumers of such sales intended those sales for PWT.

- Generally engaging in the acts and omissions described in this complaint.

125.    As a direct, proximate, and foreseeable result of the Kaplan Defendants' breaches of the Operating Agreement, Plaintiffs have suffered damages, including without limitation actual and consequential damages in an amount to be proven at trial and equal to the millions of dollars that Plaintiffs should have received in distributions but which the Kaplan Defendants stole under the pretext of the Purported Capital Call, including, but not limited to, treble damages pursuant to NRS 41.580, attorney fees, consequential damages, and other compensatory damages.

126.    As an additional remedy, Plaintiffs seek a declaration that the Purported Capital Call and related meeting minutes and resolution are null, void, and of no effect, because they were adopted without proper notice and for an improper purpose, all in

-25-

violation of Operating Agreement Section 2.2, and as more fully described above; that the Plaintiffs continue to collectively hold 50% of the membership interests of PWT, with all rights, responsibilities, and powers attendant thereto; and that Plaintiffs are entitled to be immediately paid in a priority distribution all compensation to which they have been entitled as 50% owners of the PWT since the time of the Purported Capital Call in April, 2019.

127.    As an additional remedy, Plaintiffs seek a temporary restraining order, a preliminary injunction, and a permanent injunction restraining the Defendants from acting pursuant to the Purported Capital Call and the spurious forfeiture of Plaintiff's membership interests resulting therefrom.

128.    Plaintiffs have been required to engage the services of an attorney to collect the monies due and owing, and Plaintiffs are entitled to recover their reasonable costs, attorney fees, and interest therefore.

## COUNT XII

### Breach of the Implied Covenant of Good Faith and Fair Dealing, Including Both Contractual and Tortious Breach - Kaplan Defendants

129.    Plaintiffs incorporate the allegations in the preceding paragraphs as if fully set forth herein.

130.    Pursuant to Nevada law, every contract imputes to the privies thereto an implied covenant of good faith and fair dealing, including by way of NRS 86.289.

131.    A special relationship exists between Plaintiffs, on the one hand, and the Kaplan Defendants, on the other hand, because Plaintiffs are and have been effectively "silent partners" since the time of the Purported Capital Call, and the Kaplan Defendants, as the members and managers in charge, were responsible for keeping the books, managing the day-to-day operations, making the whole venture successful and profitable, preparing tax returns, and so forth. The Kaplan Defendants' continued involvement of and control over the many key aspects of the PWT venture places him in an entrusted and fiduciary position of control over how PWT was to and did operate, upon which Plaintiffs must and did rely.

-26-

120783932.1

132.    The Kaplan Defendants breached their covenant of good faith and fair dealing under the Operating Agreement, by, among other things:

- Purporting to make a call for "Additional Capital Contributions" when such were unwarranted in light of PWT's financial performance at the time of the Purported Capital Call, on or about April 11, 2019.
- Purporting to make a call for "Additional Capital Contributions" for purposes other than "to make additional purchases and acquisitions for the Company" as required by Section 2.2 of the Operating Agreement.
- Purporting to make a call for "Additional Capital Contributions" as a pretext, sham, or sham, or other means of oppression directed towards the Plaintiffs, and not for a legitimate business purpose.
- Failing, refusing, and neglecting to make distributions to Plaintiffs as required by the Operating Agreement.
- Failing, refusing, and neglecting to pay Plaintiffs for services they rendered as employees of PWT.
- Even assuming, arguendo, that the Purported Capital Call were lawful and authorized (which it is not), thereafter failing, refusing, and neglecting to advise Plaintiffs what the supposed "Delinquency Amount" is so that Plaintiffs may resume receiving distributions, participating in management, and otherwise exercising their rights and obligations as PWT members.
- Even assuming, arguendo, that the Purported Capital Call were lawful and authorized (which it is not), thereafter failing, refusing, and neglecting to advise Plaintiffs whether PWT has simply elected to recoup the "Delinquency Amount" from "amounts otherwise distributable to the Member" pursuant to Operating Agreement Section 2.02.
- Failing, refusing, and neglecting to provide Plaintiffs with PWT books and records or any other information about PWT's performance and standing, even though Plaintiffs continue to collectively hold 50% of the PWT

120783932.1

membership interests.

- Offering significant discounts for cash payments for the purchase of goods and services pertaining to water-related products bearing King's name and/or likeness, and/or the Original Mark or the Revised Mark and then refusing to report the cash sales on the PWT books and pocketing the money, thereby depriving Plaintiffs of the value of their membership interests.

- Diverting sales from PWT to Tasty One, even though the consumers of such sales intended those sales for PWT.

- Generally engaging in the acts and omissions described in this complaint.

133.    As a direct, proximate, and foreseeable result of the Kaplan Defendants' breaches of the implied covenant of good faith and fair dealing, Plaintiffs have suffered damages, including without limitation actual and consequential damages in an amount to be proven at trial and equal to the millions of dollars that Plaintiffs should have received in distributions but which the Kaplan Defendants stole under the pretext of the Purported Capital Call, including, but not limited to, attorney fees, consequential damages, and other compensatory damages.

134.    Furthermore, the Kaplan Defendants' acts and omissions have been and are willful, wanton, intentional, and committed with malice or with reckless indifference to Plaintiffs' rights, entitling them to damages in the form of compensatory damages and punitive damages to punish Defendants for their actions and to deter them, and others, from such actions in the future.

135.    Plaintiffs have been required to engage the services of an attorney to collect the monies due and owing, and Plaintiffs are entitled to recover their reasonable costs, attorney fees, and interest therefor.

## <u>COUNT XIII</u>

### *Fraud - the Kaplan Defendants*

136.    Plaintiffs incorporate the allegations in the preceding paragraphs as if fully set forth herein.

120783932.1

137.    By entering into the Operating Agreement, the Kaplan Defendants promised, on July 14, 2017, that the parties would share equally in the ownership of PWT and its assets and that they would share the profits and losses of the PWT according to the particular terms of the Operating Agreement. The Kaplan Defendants intended to deprive Plaintiffs of the value of their membership interests through the various activities described in this complaint, including promoting the Purported Capital Call; offering significant discounts for cash payments for the purchase of goods and services pertaining to water-related products bearing King's name and/or likeness, and/or the Original Mark or the Revised Mark and then refusing to report the cash sales on the PWT books and pocketing the money, thereby depriving Plaintiffs of the value of their membership interests; diverting sales from PWT to Tasty One, even though the consumers of such sales intended those sales for PWT; and generally engaging in the acts and omissions described in this complaint.

138.    At the time the Kaplan Defendants made the above-described promises to Plaintiffs, Defendants had no intention of performing the promises created by the Operating Agreement.

139.    The promises were made by the Kaplan Defendants with the intent to induce Plaintiffs to contribute their valuable "business expertise" and, in the case of King, his goodwill, all as previously described in this complaint, from which the Kaplan Defendants could gain millions of dollars in profits and benefits for themselves.

140.    Plaintiffs, at the time the promises were made and at the time Plaintiffs took the actions alleged in this complaint, was ignorant of the Kaplan Defendants' secret intentions not to perform and could not, in the exercise of reasonable diligence, have discovered the Kaplan Defendants' secret intentions. In reliance on the Kaplan Defendants' promises, Plaintiffs contributed the consideration described in this complaint.

141.    If Plaintiffs had known of the Kaplan Defendants' actual intentions, Plaintiffs would not have taken these actions.

142.    As a proximate result of the Kaplan Defendants' fraud and the facts alleged in this complaint, Plaintiffs were induced to, and did, contribute the consideration described

-29-

3993 Howard Hughes Parkway, Suite 600
Las Vegas, Nevada 89169

LEWIS ROCA

in this complaint, which has a value of many millions of dollars, by reason of which Plaintiffs have been damaged in the sum of an amount to be proven at trial.

143.    Furthermore, the Kaplan Defendants' acts and omissions have been and are willful, wanton, intentional, and committed with malice or with reckless indifference to Plaintiffs' rights, entitling them to damages in the form of compensatory damages and punitive damages to punish the Kaplan Defendants for their actions and to deter them, and others, from such actions in the future.

144.    Plaintiffs have been required to engage the services of an attorney to collect the monies due and owing, and Plaintiffs are entitled to recover their reasonable costs, attorney fees, and interest therefore.

## COUNT XIV

### *Accounting - Defendant PWT*

145.    Plaintiffs incorporate the allegations in the preceding paragraphs as if fully set forth herein.

146.    Pursuant to the terms of the Operating Agreement, there is or may be due to Plaintiffs certain amounts to compensate them as, collectively, 50% owners of PWT as a return on Plaintiffs' investment. Although requested to do so by Plaintiffs in writing and verbally on multiple occasions, the PWT has never notified Plaintiffs of the amount of this return on investment.

147.    By reason of the above-described failure, refusal, and neglect on the part of the PWT, Plaintiffs have and do demand all of their return on investment and profit to which they are entitled by virtue of Plaintiffs' collective 50% ownership interest in PWT.

148.    PWT, acting through their Manager, Adam Kaplan, has refused, and still refuses, to turn over to Plaintiffs any money in PWT's hands, or any of the property delivered to PWT, or to render any just account; has also refused, and still refuses, to allow Plaintiffs to examine or obtain copies of all the relevant books and records containing the entries relating to PWT's property and money; and has refused, and still refuses, to give Plaintiffs proper facilities for ascertaining the facts in relation to these concerns.

-30-

120783932.1

149.    PWT has in its possession, or under its control, money and accounts, belonging to Plaintiffs, the amount of which Plaintiffs are unable to determine at this time. Plaintiffs are informed and believe, and on the basis of that information and belief allege, that at the time of the filing of this complaint the money and accounts in the hands of PWT and belonging to Plaintiffs amounted to a total value of at least $10,000,000 and likely an amount greatly in excess thereof.

150.    The nature of the transactions involved is such that by reason of their complexities, the amount due cannot be ascertained without an accounting.

151.    Plaintiffs request that PWT account to them for all money and accounts in the hands of PWT and belonging to Plaintiffs.

152.    Plaintiffs have been required to engage the services of an attorney to collect the monies due and owing, and Plaintiffs are entitled to recover their reasonable costs, attorney fees, and interest therefore.

## COUNT XV

### *Enforcement of Statutory and Contractual Right to Compel Inspection of Company Books and Records - Defendant PWT*

153.    Plaintiffs incorporate the allegations in the preceding paragraphs as if fully set forth herein.

154.    The Nevada limited liability company statute provides that "[e]ach member of a limited-liability company is entitled to obtain from the company, from time to time upon reasonable demand, for any purpose reasonably related to the interest of the member as a member of the company":

"[t]rue and, in light of the member's stated purpose, complete records regarding the activities and the status of the business and financial condition of the company";
"[t]rue and complete records regarding the amount of cash and a description and statement of the agreed value of any other property or services contributed by each member and which each member has agreed to contribute in the future, and the date on which each became a member"; and
"[o]ther records regarding the affairs of the company as is just and reasonable under the circumstances and in light of the member's stated purpose for demanding such records."

NRS 86.241(2). The right to obtain records under this provision specifically includes "the

-31-

120783932.1

right to make copies or abstracts by photographic, xerographic, electronic or other means." *Id.*

155.    Plaintiffs are member of, and have a 50% ownership interest in, PWT. Plaintiffs have invoked this statute and similar provisions of the Operating Agreement; however, PWT has so far failed, refused, and neglected to permit access, inspection, or copying of all their books and records.

156.    In particular, Plaintiffs have sought and now seek records that will permit Plaintiffs to determine whether and in what amount Plaintiffs are entitled to a distribution," including, without limitation the following records:

- A general ledger.
- Federal tax returns for the years 2017 to the present.
- Audited and/or unaudited financial statements.
- Any documentation concerning "Additional Capital Contributions" and the purposes, if any, for which such money was procured and used.
- Copies of all financial institution loan documents and ledgers showing repayment history.
- A listing of all contributions by members and distributions to members for the years 2017 to present.
- A copy of banking account statements for 2017 to the present.
- A listing of compensation or other payments for goods or services by PWT or its subsidiaries to members or persons or entities affiliated with them (i.e. family members or entities controlled by members or family members) for 2017 to present, together with a copy of all agreements providing for such payments.

157.    Because PWT has failed, refused, and neglected to permit access, inspection, or copying of its books and records, Plaintiffs seek an order compelling the examination, inspection, and copying of the above-described PWT books and records pursuant to NRS 86.243 and Operating Agreement Sections 10.2.

120783932.1

158. Plaintiffs have been required to engage the services of an attorney to collect the monies due and owing, and Plaintiffs are entitled to recover their reasonable costs, attorney fees, and interest therefor.

### COUNT XVI

#### *Constructive Trust*

159. Plaintiffs incorporate the allegations in the preceding paragraphs as if fully set forth herein.

160. As more fully described herein, Defendants have collectively perpetrated a campaign of diversion of revenue away from PWT and Plaintiffs.

161. Specifically, the Kaplans offered significant discounts for cash payments for the purchase of goods and services pertaining to water-related products bearing King's name and/or likeness, and/or the Original Mark or the Revised Mark and then refusing to report the cash sales on the PWT books and pocketing the money, thereby depriving Plaintiffs of the value of their membership interests.

162. In addition, based upon information and belief, the Defendants diverted sales from PWT to Tasty One, even though the consumers of such sales intended those sales for PWT. The Kaplans diverted the sales to Tasty One to deprive Plaintiffs out of their share of the profits they would have been due by virtue of their membership interests in PWT. Such sales by Tasty One were not authorized by Plaintiffs, and Plaintiffs were not aware of such sales when they occurred.

163. As a result of this diversion and the conversion of revenue intended for PWT and, ultimately, Plaintiffs as interest holders therein, Plaintiffs have suffered damages including, but not limited to, the amount of money converted, which is believed to be a sum ranging into the millions of dollars.

164. Plaintiff requests that the Court order a constructive trust be and remain imposed on those assets which were improperly and fraudulently transferred, diverted, and converted, as described above, and that Defendants hold legal title to said property as a constructive trustee for the use and benefit of Plaintiffs.

-33-

3993 Howard Hughes Parkway, Suite 600
Las Vegas, Nevada 89169

LEWIS ROCA

165.    A special relationship exists between Plaintiffs, on the one hand, and the Kaplan Defendants, on the other hand, because Plaintiffs are and have been effectively "silent partners" since the time of the Purported Capital Call, and the Kaplan Defendants, as the members and managers in charge, were responsible for keeping the books, managing the day-to-day operations, making the whole venture successful and profitable, preparing tax returns, and so forth. The Kaplan Defendants' continued involvement of and control over the many key aspects of the PWT venture places him in an entrusted and fiduciary position of control over how PWT was to and did operate, upon which Plaintiffs must and did rely. And of course, the Plaintiffs were unaware of the acts and omissions perpetrated by Tasty One, which was also owned and controlled by the Kaplans. In perpetrating this scheme, all Defendants have been acting as the agents, servants, employees, partners, or joint venturers of each other. Tasty one led an effort to keep the parties from dealing on equal terms because Tasty One purported to solicit and receive sales in its own right when in reality it was simply diverting sales from PWT. In other words, Tasty One purported to be acting independently from PWT but in reality this was a ruse to gain Plaintiffs' confident and by purporting to act or advise with Plaintiffs' interests in mind.

166.    The retention of legal title to the funds converted by Defendants against Plaintiffs would be inequitable.

167.    The existence of such a trust is essential to the effectuation of justice.

168.    Plaintiffs have been required to engage the services of an attorney to collect the monies due and owing, and Plaintiffs are entitled to recover their reasonable costs, attorney fees, and interest therefor.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully pray for the following relief:

A.    a preliminary and a permanent injunction, including pursuant to 15 U.S.C. § 1116(a), prohibiting Defendants and their officers, agents, servants, employees, and/or all other persons acting in concert or participation with them, from using King's name or likeness for any commercial purposes, including King's last name KING, the Original

120783932.1

Mark, and the Revised Mark, or any confusingly similar variations, without authorization;

B.    a preliminary and a permanent injunction, including pursuant to 15 U.S.C. § 1116(a) and 15 U.S.C. § 1125(d)(1)(C), prohibiting Defendants and their officers, agents, servants, employees, and/or all other persons acting in concert or participation with them, from using without authorization King's name, or any confusingly similar variations thereof, in any Internet domain name, and requiring any registrar of the Domain Name (www.KINGWaterFiltration.com) to immediately place the domain name on hold and lock, prohibiting its transfer, and, upon the entry of judgment in Plaintiffs' favor or further order of the Court, transferring the registration for the Domain Name to King;

C.    a cancellation of the three Federal Trademark Registrations or their transfer to King;

D.    compensatory, consequential, statutory, and/or exemplary damages in an amount to be determined at trial;

E.    the declaratory and injunctive relief requested;

F.    reasonable attorneys' fees under the Lanham Act;

G.    costs incurred in connection with this cause of action; and

H.    all other or further relief that the Court deems appropriate.

Dated: this 6th day of April, 2023.

Respectfully submitted,

LEWIS ROCA ROTHGERBER CHRISTIE LLP


By:  /s/ Eric N. Kohli
Eric N. Kohli (NV Bar No. 15763)
John E. Bragonje (NV Bar No. 9519)
3993 Howard Hughes Parkway, Suite 600
Las Vegas, NV 89169
T: (702) 949-8200
E-mail: EKohli@lewisroca.com
E-mail: JBragonje@lewisroca.com

*Attorneys for Plaintiffs*

120783932.1